# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Ciara Marie Davila, | : | Case No. 1:13 CV 682 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM OPINION** |
| Defendant, | : | **AND ORDER** |

## I. INTRODUCTION

Plaintiff Ciara Marie Davila ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1381 as well as a claim for Child Disability Benefits ("CIB") filed on her behalf (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 17 and 23) and Plaintiff's Reply (Docket No. 26). For the reasons that follow, the decision of the Commissioner is reversed and remanded.

## II. PROCEDURAL BACKGROUND

On December 30, 2009, Plaintiff filed an application for a period of SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381, alleging a period of disability beginning January 1, 2009 (Docket No. 11, p. 215 of 823). On that same date, Plaintiff's father, Nelson Davila, filed an

1

application for CIB on behalf of Plaintiff, also alleging a period of disability beginning January 9,

2009 (Docket No. 11, p. 219 of 823). Both claims were denied initially on June 21, 2010 (Docket No.

11, pp. 110, 117 of 823) and upon reconsideration on September 29, 2010 (Docket No. 11, pp. 127,

134 of 823). Plaintiff thereafter filed a timely written request for a hearing on October 15, 2010

(Docket No. 11, p. 141 of 823).

On December 8, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law

Judge Valencia Jarvis ("ALJ Jarvis") (Docket No. 11, pp. 42-98 of 823).[1] Also appearing at the hearing

was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 87-96 of 823). ALJ Jarvis found

Plaintiff to have a severe combination of obesity, fibromyalgia, bipolar disorder, and anxiety, with an

onset date of January 1, 2009 (Docket No. 11, p. 20 of 823).

Despite these limitations, ALJ Jarvis determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of her decision (Docket No. 11, p. 32 of 823). ALJ Jarvis found

Plaintiff had the residual functional capacity to perform medium work with the following

accommodations:

1.    Occasionally lifting and/or carrying up to fifty pounds

2.    Frequently lifting and/or carrying up to twenty-five pounds

3.    Standing and/or walking for six hours during an eight-hour workday

4.    Sitting for six hours during an eight-hour workday

5.    Unlimited pushing and/or pulling

---

[1] Plaintiff was originally scheduled for an administrative hearing on August 4, 2011 (Docket No. 11, pp. 99-104 of 823). She appeared for the hearing and requested a postponement in light of the fact that she had recently obtained counsel (Docket No. 11, pp. 99-104 of 823). ALJ Jarvis granted the request (Docket No. 11, pp. 99-104 of 823).

6.     Only occasional climbing of ladders, ropes, or scaffolds

7.     Frequent balancing, stooping, kneeling, crouching, or crawling

8.     Only simple, routine, and repetitive tasks in a work environment free of fast-paced
       production requirements

9.     Only work involving simple work-related decisions with few, if any, workplace
       changes

(Docket No. 11, p. 24 of 823). Although Plaintiff had no past relevant work, ALJ Jarvis found her

capable of performing work in the national economy (Docket No. 11, p. 31 of 823). Plaintiff's request

for benefits was therefore denied (Docket No. 13, p. 31 of 823).

On March 28, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern

Division, seeking judicial review of her denial of SSI and CIB (Docket No. 1). In her pleading,

Plaintiff alleged that the ALJ failed to properly: (1) evaluate Plaintiff's fibromyalgia when assessing

her residual functional capacity; (2) apply the treating physician rule; and (3) evaluate Plaintiff's

credibility (Docket No. 17). Defendant filed its Answer on June 17, 2013 (Docket No. 10). On August

9, 2013, in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented to the

jurisdiction of the undersigned Magistrate for all further proceedings in the case, including trial and

entry of a final judgment (Docket No. 16).


III.  FACTUAL BACKGROUND

A.     THE ADMINISTRATIVE HEARING

An administrative hearing convened on December 8, 2011 (Docket No. 11, pp. 42-98 of 823).

ALJ Jarvis presided over the hearing from St. Louis, Missouri (Docket No. 11, p. 18 of 823) while

Plaintiff, represented by counsel Louise Mosher, appeared and testified in Cleveland, Ohio (Docket

3

No. 11, pp. 47-87, 96-97 of 823). Also present and testifying was VE Thomas Mitchell ("VE Mitchell") (Docket No. 11, p. 87-96 of 823).

    1.    **PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was twenty years old and residing with her mother (Docket No. 11, pp. 47, 52, 71 of 823). Although Plaintiff graduated high school in 2009 and indicated that she took regular classes, she admitted she had numerous absences due to her pain and depression (Docket No. 11, pp. 47-48 of 823). Plaintiff was suspended twice for fights and violent outbursts, but never expelled (Docket No. 11, p. 48 of 823). Plaintiff attempted nursing school at Lorraine County Community College, but could not complete her course work due to pain, fatigue, and a general inability to focus (Docket No. 11, pp. 49-50, 71-72 of 823). Plaintiff finished only half a semester (Docket No. 11, pp. 71-72 of 823). Plaintiff stated that her mother drives her everywhere and assists with Plaintiff's medication (Docket No. 11, pp. 72-74, 76 of 823). Plaintiff has never had a job, allegedly due to her pain and inability to concentrate, but indicated that she has looked for part-time work (Docket No. 11, p. 50 of 823). Plaintiff testified that she has been in three fairly severe car accidents in her life (Docket No. 11, p. 86 of 823).

Plaintiff gave testimony concerning a number of her alleged impairments, including anxiety, depression, polycystic disease, migraines, and fibromyalgia (Docket No. 11, pp. 47-87, 96-97 of 823). With regard to her mental impairments, Plaintiff indicated that, despite being on medication, she suffers two to three panic attacks per day, which usually occur when she leaves the house (Docket No. 11, pp. 51, 56 of 823). The attacks last anywhere from five to thirty minutes (Docket No. 11, pp. 51, 57 of 823). Plaintiff testified that she very rarely goes out in public without her mother (Docket No. 11, p. 57 of 823). Plaintiff attributed her anxiety and subsequent depression to a rape she suffered when she

4

was seventeen years old (Docket No. 11, p. 54 of 823). She experiences nightmares during which she relives the incident and is now paranoid about having a sexually transmitted disease, which prompts her to be tested often (Docket No. 11, pp. 54, 82-83 of 823). Plaintiff indicated that she has no energy and suffers from "very bad" mood swings (Docket No. 11, pp. 54-55 of 823). Plaintiff also admitted that she has been physically violent during these mood swings, and was once taken to jail on a disorderly conduct charge (Docket No. 11, p. 55 of 823). Plaintiff denied trouble with alcohol or drugs (Docket No. 11, p. 56 of 823).

With regard to her physical impairments, Plaintiff testified that she has cysts on her ovaries which are very painful and cause her to bleed constantly (Docket No. 11, pp. 52, 77 of 823). Plaintiff is on medication in an attempt to shrink the cysts, and testified that surgery was a possibility (Docket No. 11, p. 52 of 823). Plaintiff also described her migraine headaches, which she noted are accompanied by a sensitivity to light (Docket No. 11, p. 67 of 823). She testified that prescription medication helps, although her headaches still occur four times per week (Docket No. 11, p. 67 of 823).

By far, Plaintiff's most severe impairment is fibromyalgia, which causes her body to "ache[] 24/7" (Docket No. 11, p. 58 of 823). Plaintiff indicated that her neck and back are the most painful and she cannot sleep at night (Docket No. 11, p. 59 of 823). Plaintiff stated that the pain was like "getting electrocuted," and rated it as a ten out of a possible ten (Docket No. 11, p. 60 of 823). Plaintiff testified that it hurts to be touched and she finds it painful to have something resting against her body (Docket No. 11, pp. 60, 80 of 823). She stated that she even has difficulty holding hands (Docket No. 11, p. 79 of 823). The pain is not as significant when Plaintiff is laying down (Docket No. 11, p. 81 of 823).

When asked to describe her daily activities, Plaintiff indicated that her mother wakes her up and makes her breakfast (Docket No. 11, p. 61 of 823). She usually stays in her pajamas all day,

5

brushes her hair and puts it into a ponytail, and does not wear makeup (Docket No. 11, pp. 61-62 of 823). Plaintiff indicated that her mother has to remind her to shower and brush her teeth (Docket No. 11, p. 62 of 823). Plaintiff then watches television and occasionally talks on the phone (Docket No. 11, p. 63 of 823). She also indicated that she eats constantly (Docket No. 11, p. 62 of 823). Plaintiff stated that she does not have any hobbies and she rarely reads because of her lack of concentration (Docket No. 11, p. 63 of 823). She does not go to church and does not have a driver's license because she is "scared to death to get in a car and drive and get behind the wheel because I've been in so many car accidents that I have panic attacks" (Docket No. 11, pp. 64-65 of 823). Plaintiff stated that she has to sit in the back seat so she does not have a panic attack and cannot take the bus (Docket No. 11, p. 65 of 823). Plaintiff indicated that she usually has two good days per week where she will clean her room, cook, do the dishes, or read and listen to music (Docket No. 11, p. 66 of 823). On bad days, Plaintiff stated that she just lays around the house and watches television (Docket No. 11, p. 66 of 823).

Plaintiff testified that she can walk a block or for approximately fifteen minutes without being in excruciating pain (Docket No. 11, p. 68 of 823). She can also stand for fifteen minutes before her legs and back start to hurt (Docket No. 11, p. 68 of 823). Plaintiff claimed that sitting is difficult, but she can usually manage fifteen minutes (Docket No. 11, p. 69 of 823). She does not have any difficulty with fine motor skills and stated that she could likely type if she tried (Docket No. 11, pp. 69-70 of 823). Plaintiff indicated that she has gained a significant amount of weight since high school, which she attributed to being less active, overeating, and depression (Docket No. 11, p. 53 of 823).

## 2. VOCATIONAL EXPERT TESTIMONY

Since Plaintiff had no past relevant work, ALJ Jarvis posed the following hypothetical question:

> I'd like you to assume an individual Ms. Davila's age, education, no previous work experience. This individual is able to lift no more than 50 pounds occasionally, lift/carry up to 25 pounds frequently. Stand/walk/sit six out of an eight-hour workday. This individual may perform unlimited push/pull. Occasionally climb ladders, ropes, scaffolds. Frequently balance, stoop, kneel . . . crouch and crawl. With those limitations, are there any jobs in the regional or national economy that individual could perform?

(Docket No. 11, pp. 87-88 of 823). VE Mitchell indicated that an individual with these limitations could do a variety of jobs at the medium level, including: (1) hand packager, listed under DOT[2] 920.587-018, for which there are 153,000 positions nationally and 30,000 in the State of Ohio; (2) linen room attendant, listed under DOT 222.387-030, for which there are 85,000 positions nationally and 3,000 in the State of Ohio; and (3) janitorial positions, listed under DOT 381.687-018, for which there are one million positions nationally and 42,000 in the State of Ohio (Docket No. 11, p. 88 of 823).

ALJ Jarvis then added to this hypothetical, questioning whether there would be any jobs for an individual with those same limitations as well as a need for a low-stress environment with minimal relating and interacting with others (Docket No. 11, p. 88 of 823). The VE indicated that the same jobs would exist, but in reduced numbers (Docket No. 11, p. 89 of 823).[3] For her third hypothetical, ALJ Jarvis used her initial limitations but added the restriction of only simple, routine, repetitive tasks in a work environment free of past-paced production requirements and only simple work-related decisions with few, if any, workplace changes (Docket No. 11, pp. 90-91 of 823). VE Mitchell stated that an individual with these limitations could still perform the jobs of hand packager, linen room attendant, or

---

[2] Dictionary of Occupational Titles.

[3] Specifically, VE Mitchell testified that, based on his experience, the number of available positions would be reduced by twenty-five percent, making them as follows: (1) hand packager, 40,000 positions nationally and 7,000 in the State of Ohio; (2) linen room attendant, 21,000 positions nationally and 750 in the State of Ohio; and (3) janitorial positions, 250,000 positions nationally and 10,000 in the State of Ohio (Docket No. 11, p. 89 of 823).

janitor, but, again, the available number of positions would be reduced by twenty-five percent (Docket

No. 11, pp. 90-91 of 823).

On cross-examination, Plaintiff's counsel posed a number of hypotheticals:

(1)    I'd like you to assume that the individual only has the ability to stand/walk for 15 minutes at a time for a total of one hour in an eight-hour workday. Would that individual be able to do any jobs in the national economy?

(2)    On any of the jobs that you have indicated, I would like you to add that the individual must have a sit/stand option at-will away from the station. Would that individual be able to do any of the jobs you've indicated or any job in the national economy?

(3)    Separate and distinct from that, I'd like you to assume that the individual is required to have unscheduled breaks every 15 minutes for about five minutes. Would that individual be able to perform any job in the national economy?

(4)    I'd like you to assume that the individual is going to be off-task with regard to attention and concentration approximately . . . 80 percent of the time. Would that individual be able to perform any job in the national economy?

(5)    Assuming that the individual is not able to arrive on time or stay the whole day, would that individual be able to perform any job in the national economy . . . I'd like you to then assume that that would happen at least four or more times per month.

(6)    I would like you to assume that the individual's ability to interact appropriately with the supervisor would only occur approximately 60 percent of the time. In other words, 40 percent of the time, the employee would not be acting appropriately, effectively with the supervisor. Would that individual be able to perform any job in the economy?

(Docket No. 11, pp. 93-95 of 823). VE Mitchell indicated that the limitations given would preclude

any employment in the national economy (Docket No. 11, pp. 93-95 of 823).

## B.    MEDICAL RECORDS

### 1.    PHYSICAL HEALTH ISSUES

Plaintiff's first record dealing with her physical health issues dates back to March 13, 2009,

8

when Plaintiff established care with Dr. Ronald Celeste ("Dr. Celeste") (Docket No. 11, p. 466 of 823). Plaintiff saw Dr. Celeste fourteen times over the next seventeen months, complaining of a variety of symptoms including severe abdominal and ovary pain (Docket No. 11, p. 466 of 823) and neck and lower back pain (Docket No. 11, pp. 458, 463 of 823). Records indicate that Dr. Celeste diagnosed Plaintiff with fibromyalgia on June 19, 2009 (Docket No. 11, p. 463 of 823) and treated Plaintiff consistently for this as well as bipolar disorder, depression, and anxiety (Docket No. 11, pp. 454-66, 809 of 823).

On April 17, 2009, Plaintiff underwent a series of ultrasounds and MRIs (Docket No. 11, pp. 429-33 of 823). The tests showed bilateral functional cysts on Plaintiff's ovaries (Docket No. 11, p. 429 of 823). Scans of Plaintiff's breasts and cervical spine were negative (Docket No. 11, pp. 431-33 of 823). The next day, Plaintiff underwent an MRI on her thoracic and lumbar spine (Docket No. 11, pp. 434-35 of 823). Both scans were unremarkable (Docket No. 11, pp. 434-35 of 823).

Plaintiff's records then jump to March 19, 2010, when Plaintiff presented, via ambulance, to the Community Regional Medical Center Emergency Room ("Regional ER") alleging that she had been assaulted and punched in the face and the back of her head (Docket No. 11, p. 693 of 823). She also claimed to have been burned with a cigarette although no burns or injuries were noted (Docket No. 11, p. 693 of 823). Hospital records indicate that Plaintiff left before being seen in a treatment room (Docket No. 11, p. 694 of 823).

On April 14, 2010, Plaintiff saw Dr. Mehdi Saghafi, MD ("Dr. Saghafi") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 11, p. 393 of 823). Plaintiff complained of mood swings, anxiety, depression, and daily throbbing headaches (Docket No. 11, pp. 393, 395 of 823). Plaintiff reported a previous diagnosis of fibromyalgia, but Dr. Saghafi noted that, upon

examination, Plaintiff did not have any warmth, redness, deformity, or stiffness in her joints (Docket No. 11, p. 395 of 823). Plaintiff did, however, moan upon flexion and extension of any kind (Docket No. 11, p. 395 of 823). Dr. Saghafi opined that Plaintiff could: (1) sit, stand, and walk six to eight hours per day; (2) lift and/or carry thirty pounds frequently and fifty pounds occasionally; (3) push, pull, and manipulate objects; (4) operate hand and foot-controlled devices; (5) drive; and (6) climb stairs (Docket No. 11, p. 397 of 823). Plaintiff did not need an ambulatory aid and had a normal manual muscle evaluation (Docket No. 11, pp. 397-401 of 823). Her speech, hearing, memory, orientation, and attention were all within a normal range (Docket No. 11, p. 397 of 823). Dr. Saghafi diagnosed Plaintiff with obesity, anxiety/depression (per subjective history), and fibromyalgia (per subjective history) (Docket No. 11, p. 397 of 823).

On September 11, 2010, Plaintiff again returned to the Regional ER claiming that she had been assaulted (Docket No. 11, pp. 571, 573 of 823). Scans of Plaintiff's cervical spine and head were normal and Plaintiff was diagnosed with a neck strain (Docket No. 11, pp. 571, 573, 689 of 823). On April 8, 2011, Plaintiff underwent imaging on her cervical spine and facial bones after an alleged fall (Docket No. 11, p. 574 of 823). The scans showed bilateral nasal bone fractures but no evidence of cervical spine issues (Docket No. 11, p. 574 of 823). On April 13, 2011, Plaintiff saw Dr. George Ozbardakci, MD ("Dr. Ozbardakci") complaining of pain and swelling (Docket No. 11, p. 629 of 823). Plaintiff claimed that she had been hit in the nose by a friend's elbow as they were going down stairs after which she fell and hit the metal railing (Docket No. 11, p. 629 of 823). Dr. Ozbardakci confirmed the diagnosis of a nasal bone fracture (Docket No. 11, p. 630 of 823).

On April 26, 2011, Plaintiff attended an initial consultation with Dr. Dhrub R. Patel, MD ("Dr. Patel") complaining of pain and migraines (Docket No. 11, p. 614 of 823). Plaintiff reported a history

10

of multiple car accidents and falling incidents as well as approximately twenty migraines per month (Docket No. 11, p. 614 of 823). At the time, Plaintiff was not on any medication for her pain or migraines (Docket No. 11, p. 615 of 823). A general examination revealed multiple tender points, although Plaintiff had full strength and normal gait (Docket No. 11, p. 616 of 823). Plaintiff was diagnosed with fibromyalgia with multiple tender points and migraine headaches and Dr. Patel recommended that she undergo a nerve conduction study (Docket No. 11, pp. 616-17 of 823). Plaintiff underwent the first of two studies on June 2, 2011, on her upper extremities (Docket No. 11, p. 800 of 823). The study showed normal nerve conduction, no evidence of myositis or compression neuropathy, and isolated radicular changes at the C5 and C6 vertebrae that were minor and without any active denervation (Docket No. 11, p. 800 of 823). A second study of Plaintiff's lower extremities was conducted on June 16, 2011 (Docket No. 11, pp. 618-21 of 823). The scan was normal with no suggestion of polyneuropathy, myopathy, or myositis (Docket No. 11, p. 618 of 823). There were isolated radicular changes at the L3 vertebrae, but only minor decreased activated units (Docket No. 11, p. 618 of 823). On September 7, 2011, Plaintiff underwent an x-ray of her cervical spine (Docket No. 11, p. 641 of 823). The scan was normal (Docket No. 11, p. 641 of 823).

Plaintiff returned to Dr. Patel on September 16, 2011, complaining of fibromyalgia and migraine headaches (Docket No. 11, p. 610 of 823). Plaintiff reported tingling on her left side accompanied by a shooting pain (Docket No. 11, p. 610 of 823). She indicated that prescription medication helped her migraines (Docket No. 11, p. 610 of 823). Dr. Patel reported that "all [Plaintiff's] laboratory tests [were] normal," and Plaintiff was able to stand from a sitting position without difficulty (Docket No. 11, pp. 610, 612 of 823). Plaintiff's gait and stance were also normal (Docket No. 11, p. 312 of 823). Dr. Patel diagnosed Plaintiff with fibromyalgia with multiple tender

11

points (Docket No. 11, pp. 612-13 of 823).

Throughout 2011, Plaintiff also saw Dr. Jose E. Mendoza, MD ("Dr. Mendoza"). Dr. Mendoza noted some unspecified back pain, myalgias and myositis, but consistently reported that Plaintiff had normal musculature and range of motion with no joint deformities or abnormalities (Docket No. 11, pp. 566, 562, 569, 588, 794 of 823). On November 18, 2011, Dr. Mendoza noted that Plaintiff exhibited tenderness in her shoulders, upper arms, right hip, and thoracic and lumbar back and diagnosed Plaintiff with fibromyalgia (Docket No. 11, p. 794 of 823). Plaintiff was started on a daily dose of Milnacipran (Docket No. 11, p. 794 of 823).

### 2.  MENTAL HEALTH ISSUES

On January 21, 2010, Plaintiff presented to the Nord Center where a diagnostic assessment was conducted (Docket No. 11, p. 353 of 823). She reported hearing voices and having mood swings, panic attacks, hallucinations of a little girl, and difficulty sleeping (Docket No. 11, p. 353 of 823). Plaintiff also reported that the Xanax and Celexa prescribed to her by Dr. Celeste were not working (Docket No. 11, p. 353 of 823). She denied substance abuse but stated that she had been raped by an unknown individual when she was seventeen years old (Docket No. 11, pp. 353-54 of 823). Plaintiff reported depression, anxiety, and anger, but was alert, oriented, cooperative, pleasant, and had rapid speech (Docket No. 11, pp. 358, 361 of 823). She indicated that she would "feel happy, clean, [and] cook" approximately four days per week but also indicated that she would have depressive episodes that lasted "a day to a week to a month" where would lay in bed and not get up (Docket No. 11, p. 361 of 823). Staff at the Nord Center diagnosed Plaintiff with mood disorder not otherwise specified ("NOS"), post traumatic stress disorder ("PTSD"), cannabis abuse, and assigned her a Global

Assessment of Functioning ("GAF") score of fifty-six[4] (Docket No. 11, p. 362 of 823). They recommended further counseling and a vocational referral (Docket No. 11, p. 361 of 823).

Plaintiff returned to the Nord Center six times in 2010 and once in 2011 (Docket No. 11, pp. 378, 379, 380, 384, 385, 699 of 823). In February 2010, Plaintiff reported problems with motivation, concentration, fatigue, appetite changes, irritability, aggression, and hallucinations (Docket No. 11, p. 385 of 823). In March 2011, Plaintiff was still complaining of these same symptoms, although she denied delusions or hallucinations (Docket No. 11, pp. 699, 705 of 823). Plaintiff reported being unmotivated and not taking responsibility for her actions (Docket No. 11, p. 725 of 823). Plaintiff was again diagnosed with PTSD with a rule-out diagnosis of bipolar disorder (Docket No. 11, p. 706 of 823). Plaintiff's file with the Nord Center was officially closed on April 26, 2011 (Docket No. 11, p. 709 of 823). Her GAF score at that time was fifty[5] and staff indicated that her problems were still unresolved (Docket No. 11, pp. 709-10 of 823).

In May 2011, Plaintiff began treatment at the Far West Center with licensed professional clinical counselor Brenda Dillane ("Ms. Dillane") (Docket No. 11, p. 546 of 823). Plaintiff complained of mood swings, poor sleep, high anxiety, chronic pain, and panic attacks, and was on Xanax (Docket No. 11, p. 546 of 823). Ms. Dillane found that Plaintiff was alert and oriented, had an intact memory, and average to above average intelligence (Docket No. 11, p. 549 of 823). Plaintiff's speech and thoughts were clear and her insight and judgment were fair to good (Docket No. 11, p. 549 of 823).

_____

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of fifty-six indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[5] A score of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

Ms. Dillane diagnosed Plaintiff with bipolar disorder (per Plaintiff's given subjective history), anxiety

disorder NOS, and PTSD (Docket No. 11, p. 549 of 823). During an appointment in mid-July 2011,

Ms. Dillane noted that Plaintiff had not made any significant progress (Docket No. 11, p. 775 of 823).

By July 28, 2011, Plaintiff reported being aggravated and hateful and wanting to sleep all day (Docket

No. 11, p. 774 of 823). Plaintiff's sessions often focused on her difficulty with her mother (Docket No.

11, p. 773 of 823). In October 2011, Plaintiff reported trouble sleeping and increased anxiety with at

least two panic attacks per day (Docket No. 11, p. 772 of 823). However, Ms. Dillane noted that she

was pleased with Plaintiff's increased energy and motivation and noted that Plaintiff was considering

returning to college (Docket No. 11, p. 772 of 823).

C.    EVALUATIONS

1.    PSYCHIATRIC EVALUATIONS

On April 5, 2010, Plaintiff underwent a Psychiatric Evaluation with Dr. Praveen Abraham, DO

("Dr. Abraham") at the request of Dr. Celeste (Docket No. 11, pp. 626-28 of 823). Plaintiff was

pleasant, cooperative, and alert, but exhibited psychomotor agitation (Docket No. 11, p. 627 of 823).

Her thoughts were logical and goal-directed and her insight and judgment were adequate (Docket No.

11, p. 627 of 823). Plaintiff was diagnosed with probable bipolar disorder (type I), panic disorder, and

psychosis (Docket No. 11, p. 627 of 823). She was started on Depakote (Docket No. 11, p. 627 of

823).

On September 8, 2011, Plaintiff completed a Psychiatric Evaluation with advanced nurse

practitioner Grace Herwig ("Ms. Herwig") (Docket No. 11, pp. 777-80 of 823). Ms. Herwig diagnosed

Plaintiff with bipolar disorder and anxiety disorder and assigned her a GAF score of fifty (Docket No.

11, p. 780 of 823).

14

2.     PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS

Plaintiff underwent several Physical Residual Functional Capacity Assessments, the first being on May 4, 2010, with state examiner Dr. Gerald Klyop, MD ("Dr. Klyop") (Docket No. 11, pp. 412-19 of 823). Dr. Klyop concluded that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 11, p. 413 of 823). Plaintiff was limited to only occasional climbing of ladders, ropes, and scaffolds, but otherwise had no postural, manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 414-16 of 823).

On July 24, 2010, Plaintiff was evaluated by physical therapist Adrian Williams ("Mr. Williams") at the request of Dr. Celeste (Docket No. 11, pp. 516-22 of 823). Mr. Williams found Plaintiff had tenderness upon palpation of multiple joints and had difficulty completing many of the evaluation tests (Docket No. 11, pp. 516-22 of 823). He also noted that Plaintiff gave sub-maximum effort (Docket No. 11, p. 522 of 823). Mr. Williams was unable to classify Plaintiff's physical ability into any type of sedentary, light, medium, or heavy activity (Docket No. 11, p. 521 of 823).

On November 4, 2011, Plaintiff's gynecologist, Dr. Alexander Boye-Doe ("Dr. Boye-Doe") completed a general medical source statement (Docket No. 11, pp. 732-36 of 823). Dr. Boye-Doe concluded that Plaintiff could stand, walk, and sit for a total of fifteen minutes or less at one time and only for a daily total of one hour (Docket No. 11, p. 734 of 823). Dr. Boye-Doe also concluded that Plaintiff would require a job with an at-will sit/stand option where she could take unscheduled breaks and elevate her legs (Docket No. 11, p. 734 of 823). Plaintiff could occasionally lift less than ten pounds, twist, stoop, crouch/squat, bend, drive, and climb stairs (Docket No. 11, p. 735 of 823). Dr.

15

Boye-Doe estimated that Plaintiff would be absent from work more than four days per month (Docket

No. 11, p. 735 of 823).

Ms. Dillane completed a similar assessment on November 17, 2011 (Docket No. 11, pp. 748-51

of 823). Ms. Dillane indicated that Plaintiff would be able to: (1) follow work rules thirty percent of

the time; (2) relate to coworkers twenty percent of the time; (3) deal with the public and use judgment

fifty percent of the time; and (4) never interact with supervisors, deal with ordinary work stress,

function independently, or maintain attention and concentration (Docket No. 11, p. 748 of 823). Ms.

Dillane also concluded that Plaintiff had no ability to: (1) understand, remember, and carry out

complex job instructions; (2) understand, remember, and carry out detailed, but not complex, job

instructions; (3)  behave in an emotionally stable manner; and (4) relate predictably in social situations

(Docket No. 11, p. 750 of 823). Plaintiff had limited ability to: (1) understand, remember, and carry

out simple job instructions; (2) maintain her personal appearance; and (3) demonstrate reliability

(Docket No. 11, pp. 749-50 of 823). Ms. Dillane also opined that Plaintiff would miss more than four

days of work per month (Docket No. 11, p. 750 of 823).

On that same date, Ms. Herwig concluded that Plaintiff would be able to: (1) follow work rules;

(2) relate to co-workers; (3) deal with the public; (4) use judgment; (5) interact with supervisors; (6)

understand, remember and carry out simple job instructions; and (7) maintain personal appearance *at*

*least* fifty percent of the time (Docket No. 11, pp. 789-91 of 823). Plaintiff would be able to: (1) deal

with ordinary work stress; (2) function independently; (3) maintain attention and/or concentration; (4)

understand, remember, and carry out complex job instructions; (5) understand, remember, and carry

out detailed, but not complex, job instructions; (6) behave in an emotionally stable manner; (7) relate

predictably to others; and (8) demonstrate reliability *less than*, and in some cases much less than, fifty

16

percent of the time (Docket No. 11, pp. 789-91 of 823). Ms. Herwig opined that Plaintiff would miss more than four days of work per month (Docket No. 11, p. 791 of 823).

On December 2, 2011, Dr. Mendoza reported that Plaintiff could: (1) stand or walk for fifteen minutes at a time; (2) stand or walk for a total of one hour during an eight-hour workday; (3) sit for thirty minutes at one time; and (4) sit for a total of two hours during an eight-hour workday (Docket No. 11, p. 806 of 823). Dr. Mendoza also concluded that Plaintiff would require an at-will sit/stand option as well as unscheduled breaks and the ability to elevate her legs (Docket No. 11, p. 806 of 823). He opined that Plaintiff could occasionally lift less than ten pounds, rarely twist, stoop, and climb stairs, and never crouch, squat, or bend (Docket No. 11, p. 807 of 823). Dr. Mendoza stated that Plaintiff would miss more than four days of work per month (Docket No. 11, p. 807 of 823).

### 3.    PSYCHOLOGICAL EVALUATION

On June 3, 2010, Plaintiff underwent a psychological evaluation with state examiner Dr. Ronald G. Smith, Ph.D ("Dr. Smith") (Docket No. 11, pp. 420-26 of 823). Plaintiff complained of depression, difficulty sleeping, auditory hallucinations, and lack of motivation (Docket No. 11, pp. 422-23 of 823). She was cooperative in the evaluation, and Dr. Smith noted that she was direct and to the point in her responses, displayed organized thinking, a good range of affect, and was alert and in good contact with reality (Docket No. 11, pp. 423-24 of 823). Plaintiff also displayed fairly good insight and judgment (Docket No. 11, p. 424 of 823). Dr. Smith made a point to note that Plaintiff's mother twice interrupted the interview, and he later described Plaintiff's mother as "intrusive and overbearing" (Docket No. 11, pp. 422, 424, 425 of 823). Dr. Smith diagnosed Plaintiff with bipolar disorder II (current episode depressed with psychotic features) and assigned her a GAF score of forty-

seven[6] (Docket No. 11, p. 425 of 823). He found Plaintiff's ability to relate to others and maintain

attention, concentration, and persistence to be moderately impaired and her ability to withstand the

stress and pressure of day-to-day work activity to be markedly impaired (Docket No. 11, p. 426 of

823). Plaintiff had no impairment in her ability to understand, remember, and follow instructions

(Docket No. 11, p. 426 of 823).

### 4.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On June 8, 2010, Plaintiff underwent a Mental Residual Functional Capacity Assessment with

state examiner Dr. Paul Tangeman, Ph.D ("Dr. Tangeman") (Docket No. 11, pp. 468-71 of 823). Dr.

Tangeman found Plaintiff to be moderately limited in her ability to: (1) understand and remember

detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for

extended periods; (4) perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; (5) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7)

accept instructions and respond appropriately to criticism from supervisors; (8) get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) respond

appropriately to changes in the work setting (Docket No. 11, pp. 468-69 of 823).

### 5.    PSYCHIATRIC REVIEW TECHNIQUE

On that same date, Dr. Tangeman also conducted a Psychiatric Review Technique (Docket No.

11, pp. 472-85 of 823). Dr. Tangeman diagnosed Plaintiff with a mood disorder NOS, bipolar disorder,

_____

[6] A score of forty-seven indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

PTSD, and cannabis abuse (Docket No. 11, pp. 472-81 of 823). With regard to "Paragraph B" criteria,[7] Dr. Tangeman found Plaintiff had moderate limitations with regard to: (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence, or pace (Docket No. 11, p. 482 of 823). Dr. Tangeman found no episodes of decompensation or presence of "Paragraph C" criteria[8] (Docket No. 11, p. 483 of 823).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

---

[7] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[8] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

20

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Jarvis made the following findings:

1.    Plaintiff had not attained age 22 as of January 1, 2009, the alleged onset date.

2.    Plaintiff has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.

3.    Plaintiff has the following severe impairments: obesity, fibromyalgia, bipolar disorder, and anxiety.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform medium work with the following limitations: (1) lift no more than fifty pounds occasionally; (2) lift no more than twenty-five pounds frequently; (3) stand and/or walk for six hours during an eight-hour day; (4) sit for six hours during an eight-hour day; (5) unlimited pushing or pulling; (6) only occasional climbing of ladders, ropes, or scaffolds; (7) frequent balancing, stooping, kneeling, crouching, or crawling; (8) only simple, routine, repetitive tasks done in a work environment free of fast-paced production requirements; and (9) only work that involves simple work-related decisions and few, if any, workplace changes.

6.    Plaintiff has no past relevant work.

7.    Plaintiff was 17 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    Plaintiff has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because Plaintiff does not have past relevant work.

10.    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.     Plaintiff has not been under a disability, as defined in the Social Security Act, from
        January 1, 2009, through the date of this decision.

(Docket No. 11, pp. 18-32 of 823). Plaintiff's request for benefits was therefore denied (Docket No.

11, p. 32 of 823).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A.     PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ failed to properly evaluate: (1) Plaintiff's fibromyalgia as it

22

relates to her residual functional capacity; (2) the opinions of Plaintiff's alleged treating physician, Dr. Mendoza, nurse practitioner Ms. Herwig, and licensed professional counselor Ms. Dillane; and (3) Plaintiff's credibility in light of her fibromyalgia (Docket No. 17).

**B.    DEFENDANT'S RESPONSE**

Defendant disagrees, arguing that the ALJ's decision is supported by substantial evidence (Docket No. 23).

**C.    DISCUSSION**

**1.    FIBROMYALGIA AND RESIDUAL FUNCTIONAL CAPACITY**

Plaintiff first argues that ALJ Jarvis improperly evaluated Plaintiff's admitted severe impairment of fibromyalgia as it relates to her residual functional capacity (Docket No. 17, pp. 7-9 of 15). Specifically, Plaintiff alleges that the ALJ required more from the objective evidence than could be expected from such a diagnosis, given that courts have in the past held that fibromyalgia cannot be diagnosed through typical objective means (Docket No. 17, p. 8 of 15). Defendant agrees that it is the effect of Plaintiff's alleged fibromyalgia on her functional abilities that is key to a finding of disability, but argues that Plaintiff's fibromyalgia does not have more than a *minimal* effect on her ability to work (Docket No. 23, pp. 12-13 of 18). As Plaintiff's argument necessarily ties into an assessment of her limitations, a discussion of residual functional capacity is helpful.

**a.    RESIDUAL FUNCTIONAL CAPACITY**

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities.

23

*Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

**b.    PLAINTIFF'S CASE**

The Sixth Circuit has repeatedly recognized that fibromyalgia can be a severe impairment. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (*citing Preston v. Sec'y of Health &*

*Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam)). However, tying this severe impairment to an actual finding of disability can be problematic: "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Id*. "Rather, fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Rogers*, 486 F.3d at 244 (internal citations omitted). "Fibromyalgia's causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Minor v. Comm'r of Soc. Sec.*, 513 Fed.Appx. 417, 434 (6th Cir. 2013) (*citing Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)).

Here, it is clear that Plaintiff has a diagnosis of fibromyalgia: she was diagnosed by multiple doctors including Dr. Celeste in June 2009 (Docket No. 11, p. 462 of 823), Dr. Saghafi in April 2010 (Docket No. 11, p. 397 of 823), Dr. Patel in April 2011 (Docket No. 11, pp. 616-17 of 823), and Dr. Mendoza in November 2011 (Docket No. 11, p. 794 of 823). Indeed, ALJ Jarvis found fibromyalgia to be among Plaintiff's severe impairments for disability purposes (Docket No. 11, p. 20 of 823). In light of this severe impairment, ALJ Jarvis was required to concentrate her inquiry into Plaintiff's residual functional capacity on Plaintiff's subjective complaints of pain and limitation and how that would limit Plaintiff's ability to work. However, ALJ Jarvis instead chose to focus her assessment on the lack of confirming objective medical evidence. This is an error.

Plaintiff's record is replete with her complaints of pain, fatigue, and inability to engage in basic activities of daily living (Docket No. 11, pp. 250-51, 278, 358, 395, 454, 458, 463, 610, 616, 740-42, 794 of 823). She compared her constant pain to "getting electrocuted" and rated it as a ten out of a

possible ten (Docket No. 11, p. 60 of 823). Family and friends confirmed Plaintiff's complaints and limited ability (Docket No. 11, pp. 302, 313-18, 321-26 of 823). According to Plaintiff and as confirmed by school records, she had multiple school absences as a result of her constant pain (Docket No. 11, pp. 304-12 of 823). During an April 2010 appointment with Dr. Saghafi, Plaintiff had pain upon flexion and extension (Docket No. 11, p. 395 of 823). In July 2010, physical therapist Mr. Williams noted that Plaintiff had multiple tender points (Docket No. 11, pp. 516-22 of 823). This was confirmed by Dr. Patel during an April 2011 appointment (Docket No. 11, p. 616 of 823). By November 2011, Plaintiff had been started on a daily dose of Milnacipran to help manage her pain (Docket No. 11, p. 794 of 823).

ALJ Jarvis' reliance on the lack of objective medical evidence is wholly inconsistent with Plaintiff's diagnosis of fibromyalgia. "Unlike other medical conditions, fibromyalgia is not amenable to objective diagnosis and standard clinical tests are 'not highly relevant' in diagnosing or assessing fibromyalgia or its severity." *Lawson v. Comm'r of Soc. Sec.*, 695 F.Supp.2d 729, 744 (S.D. Ohio 2010) (*citing Preston*, 854 F.2d at 820). The ALJ failed to discuss, or at the very least acknowledge, the correct standard for addressing Plaintiff's impairment and the possible functional limitations it produces. Therefore, the decision of the Commissioner with regard to Plaintiff's residual functional capacity as a result of her fibromyalgia is reversed and remanded for further evaluation pursuant to sentence four of 42 U.S.C. § 405(g).

### 2.    TREATING PHYSICIAN RULE

Plaintiff next argues that the ALJ failed to properly evaluate the opinions of Plaintiff's treating physicians and other medical professionals according to the treating physician rule (Docket No. 17, pp. 9-13 of 15). More specifically, Plaintiff alleges that ALJ Jarvis erred by assigning less than controlling

weight to the opinions of Dr. Mendoza, advanced nurse practitioner Ms. Herwig, and licensed

counselor, Ms. Dillane (Docket No. 17, pp. 9-13 of 15). Plaintiff is only partially correct.

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).
>
> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.
>
> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first

determine which physicians she will consider to be "treating sources." "A physician is a treating

source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)).

        a.       DR. MENDOZA

Contrary to the ALJ's decision stating that Plaintiff saw Dr. Mendoza on only one occasion (Docket No. 11, p. 29 of 823), Plaintiff's medical records show that she actually saw the doctor on five occasions from March through November 2011 (Docket No. 11, pp. 560-77, 586, 793-94 of 823). Dr. Mendoza examined Plaintiff during each of these visits and ultimately prescribed Plaintiff a daily dose of Milnacipran to combat her complaints of fibromyalgia and chronic pain (Docket No. 11, pp. 560-67, 586, 793-94 of 823). The Magistrate finds that Dr. Mendoza is a treating physician.

Once accorded treating physician status, Dr. Mendoza's opinion is entitled to controlling weight. *See Blakley*, 581 F.3d at 406. To assign anything less requires the ALJ to specifically determine and state the amount of weight given to the opinion, based on the factors iterated in *Blakley*, originally set forth in 20 C.F.R. § 404.1527(d)(2): (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) any specialization of the treating physician.

Here, ALJ Jarvis assigned Dr. Mendoza's opinion little weight, citing to Plaintiff's infrequency of visits, failure to review Plaintiff's complete record, and general inconsistency with the objective medical evidence of record (Docket No. 11 p. 29 of 823). As already discussed, the ALJ erroneously found that Plaintiff saw Dr. Mendoza only once, on November 18, 2011, when, in reality, Plaintiff saw

Dr. Mendoza a total of five times between March and November 2011 (Docket No. 11, pp. 560-67, 586, 793-94 of 823). In addition to this error, ALJ Jarvis failed to discuss the nature and extent of the treating relationship between Plaintiff and Dr. Mendoza as well as the supportability of Dr. Mendoza's opinion.

ALJ Jarvis discounted the findings of Dr. Mendoza on the ground that Dr. Mendoza merely submitted a "check the box" medical source statement that was not supported by the evidence (Docket No. 11, pp. 28-29 of 823). The ALJ also stated that Dr. Mendoza did not have the opportunity to review Plaintiff's complete record, *despite the fact* that Dr. Mendoza is Plaintiff's most recent treating physician (Docket No. 11, p. 29 of 823). It is unclear as to how ALJ Jarvis arrived at this conclusion. Furthermore, the ALJ made it a point to note, while discussing Dr. Mendoza's opinion, that Plaintiff "had a history of making false statements to her treatment providers" (Docket No. 11, p. 29 of 823). Again, it is unclear as to how the ALJ arrived at this conclusion or why this is relevant to the weight assigned to Dr. Mendoza's opinion. The ALJ seemed to further discount Dr. Mendoza's opinion by finding it was contradicted by the opinion of one-time consultative examiner Dr. Saghafi, who saw Plaintiff nearly a year earlier, in April 2010 (Docket No. 11, pp. 29, 393-401 of 823). ALJ Jarvis made no mention of the consistency of Dr. Mendoza's opinion with that of Plaintiff's other treating physicians Dr. Celeste and Dr. Patel (Docket No. 11, pp. 28-29 of 823).

An ALJ must give good reasons in his notice of determination or decision for the weight she gives a claimant's treating physician. *Blakley*, 581 F.3d at 407; *see also* 20 C.F.R. § 404.1527(c)(2). These good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 407 (*quoting SSR* 96-

29

2p, 1996 SSR LEXIS 9 at *12) (internal quotations omitted)). ALJ Jarvis failed to provide these "good reasons" in her written opinion.

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). Courts have remanded the decision of the Commissioner when it has failed to articulate "good reasons" for not crediting the opinion of a claimant's treating physician. *Wilson*, 378 F.3d at 545.

Therefore, based on the ALJ's failure to abide by the requirements of the treating physician rule, the Magistrate reverses and remands the decision of the Commissioner with regard to the weight assigned to the opinion of Dr. Mendoza for further analysis, pursuant to sentence four of 42 U.S.C. § 405(g).

### b. MS. HERWIG AND MS. DILLANE

Unlike Dr. Mendoza, and contrary to what Plaintiff would have this Court believe, the opinions of Ms. Herwig and Ms. Dillane are *not* entitled to controlling weight. Under Social Security Regulations, "acceptable medical sources" include: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a)(1)-(5). It is only these physicians and medical professionals whose opinions are presumptively entitled to *controlling* weight under the Regulations. Other treatment providers, including treating nurse practitioners, known under the Regulations as "other sources," are not entitled to the same controlling weight or deference to which the opinions of these

treating physicians are normally entitled. *See Dudich v. Colvin*, 2013 U.S. Dist. LEXIS 158304, *30

(N.D. Ohio 2013) (*citing Starr v. Comm'r of Soc. Sec.*, 2013 U.S. Dist, LEXIS 23980, *5 (S.D. Ohio

2013)).          This does not mean that the opinions of Ms. Herwig and Ms. Dillane are irrelevant,

however. Evidence from "other sources," including nurse practitioners, may be used "to show the

severity of [a claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. §

404.1513(d). Rather than a presumption of controlling weight, an ALJ is vested with the discretion to

determine the proper weight assigned to these other sources based on the evidence of record. *Cruse v.

Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). "Among the factors to be considered in

evaluating the opinions of these 'other sources' are the length of time and frequency of treatment,

consistency with other evidence, the degree to which the source presents relevant evidence to support

the opinion, how well the opinion is explained, whether the source has a special expertise, and any

other factor supporting or refuting the opinion." *Dudich*, 2013 U.S. Dist. LEXIS 158304 at *30-31

(*citing* 2006 SSR LEXIS 5, *4-5 (2006)). An ALJ need not weigh each of these factors in every case;

rather, the evaluation is dependent upon the specific evidence presented in each case. *Id.* (*citing* 2006

SSR LEXIS 5 at *5). However, an ALJ "generally should *explain* the weight given to opinions from

these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or

decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 2006 SSR

LEXIS 5 at *15 (emphasis added).

          Here, ALJ Jarvis dismisses the opinions of both Ms. Herwig and Ms. Dillane in short order,

assigning them both little weight (Docket No. 11, p. 29 of 823). While certainly within the ALJ's

discretion, the ALJ fails to provide any explanation as to *why* she assigned the opinions little weight

(Docket No. 11, p. 29 of 823). In fact, the only information the ALJ provides about these opinions is

31

that they are not consistent with the balance of the record and that Ms. Dillane's opinion is inconsistent

with her own treatment records (Docket No. 11, p. 29 of 823). No further explanation is given (Docket

No. 11, p. 29 of 823). Therefore, while not entitled to controlling weight, the Magistrate still finds that

the decision of the Commissioner must be reversed and remanded for further discussion and

explanation of the weight assigned to the opinions of Ms. Herwig and Ms. Dillane, pursuant to

sentence four of 42 U.S.C. § 405(g).

### c.    PLAINTIFF'S CREDIBILITY

Finally, Plaintiff alleges that the ALJ failed to properly evaluate Plaintiff's credibility in light

of her fibromyalgia diagnosis (Docket No. 17, pp. 13-15 of 15). Defendant disagrees, arguing that the

ALJ based her decision regarding Plaintiff's credibility on substantial evidence, namely, established

medical findings as well as Plaintiff's inconsistent statements (Docket No. 23, pp. 16-17 of 18).

Oftentimes in disability cases, "the cause of the disability is not necessarily the underlying

condition itself, but rather the *symptoms* associated with the condition." *Rogers*, 486 F.3d at 247.

When this is the case, the Commissioner must use a two-part analysis in evaluating a claimant's

subjective complaints. 20 C.F.R. § 416.929(a); *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.

2001). First, the ALJ must determine whether there is an underlying medically determinable physical

impairment that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R.

§ 416.929(a). Second, if the ALJ finds that such an impairment exists, she must then evaluate the

intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work

activities. 20 C.F.R. § 416.929(a). Relevant factors for this portion of the analysis include: (1) a

claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3)

factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side

effects of any medication taken to alleviate the symptoms; (5) other treatment or measures undertaken

to relieve the symptoms; and (6) any other factors bearing on the limitations of the claimant to perform

basic functions. 20 C.F.R. § 416.929(a); *see also* Social Security Ruling 96-7p, 1996 SSR LEXIS 4,

*2-4 (July 2, 1996). An ALJ's determination of the credibility of a claimant must be "based on a

consideration of the entire case record." 1996 SSR LEXIS 4 at *6. Social Security Ruling 96-7p

requires an ALJ to explain her credibility determinations in her written opinion and the explanation

"must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 SSR

LEXIS at *12. The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v.

Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Jarvis did not accord Plaintiff's subjective statements *any* credibility (Docket No.

11, p. 25 of 823). The ALJ cited several reasons for her decision, including: (1) lack of objective

medical evidence; (2) Plaintiff's relatively routine and conservative treatment; (3) Plaintiff's generally

unpersuasive testimony at the administrative hearing; and (4) Plaintiff's ability to sit through the

ninety-minute administrative hearing , requesting only once to stand up  for approximately two

minutes (Docket No. 11, pp. 26-27 of 823). While ALJ Jarvis is correct in that Plaintiff's subjective

allegations of pain do not correspond to the objective evidence of record, it is important to once again

note that fibromyalgia as a disability cannot be determined based on objective evidence alone.

Furthermore, a claimant's statements about the intensity or persistence of pain and the effect that the

pain has on her ability to work "may not be disregarded solely because they are not substantiated by

objective medical evidence." 1996 SSR LEXIS 4 at *2-4.

However, ALJ Jarvis also cites Plaintiff's routine and conservative treatment and generally

33

unpersuasive hearing testimony as reasons for finding Plaintiff incredible (Docket No. 11, pp. 26-27 of 823). As the ALJ noted, Plaintiff was able to sit in a chair for the entire ninety-minute administrative hearing, only needing to stand once for approximately two minutes *despite* claiming a general inability to be touched or even have her back against a chair due to severe pain (Docket No. 11, p. 27 of 823). ALJ Jarvis also noted that Plaintiff testified that she rarely went outside her house due to panic attacks but, in 2009, reported that she went to the movies and went bowling (Docket No. 11, pp. 27, 724 of 823). The ALJ made no further reference to Plaintiff's daily activities, the location, duration, frequency, and intensity of Plaintiff's symptoms, factors that precipitated or aggravated Plaintiff's symptoms, or any other factors bearing on Plaintiff's limitations to perform basic functions.

While credibility determinations ultimately rest with the ALJ, these determinations must "be reasonable and supported by substantial evidence." *Rogers*, 486 F.3d at 249. ALJ Jarvis' decision "fails to "contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 SSR LEXIS 4 at *12. Nor is the ALJ's opinion "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight [the ALJ] gave to [Plaintiff's] statements and the reasons for that weight." 1996 SSR LEXIS 4 at *12. Therefore, the decision of the Commissioner on the issue of Plaintiff's credibility is reversed and remanded for further evaluation pursuant to sentence four of 42 U.S.C. § 405(g).

## VIII. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the Commissioner shall consider: (1) whether Plaintiff is disabled due to fibromyalgia using the standard set forth for analyzing that particular impairment; (2) the weight assigned to the opinion of Dr. Mendoza given his classification as a

34

treating physician; and (3) Plaintiff's credibility based on the two-prong test used when determining credibility based solely on allegations of pain. The Commissioner shall also include further explanation as to the weight assigned to the opinions of Ms. Herwig and Ms. Dillane. **IT IS SO ORDERED.**

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 28, 2014

35